UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONNA GRIFFIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 8135 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, a municipal corporation, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Donna Griffin lost her position as a candidate paramedic in the Candidate Fire Paramedic Training Program (the "Academy") when the Chicago Fire Department ("CFD") determined Griffin was not medically fit because she took medication, specifically alprazolam and trazodone, to treat her adjustment disorder with anxious mood and secondary insomnia. In response, Griffin filed this lawsuit against Defendant City of Chicago, alleging discrimination and failure to accommodate in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/2-102. The City moves for summary judgment on all of Griffin's claims, which the Court grants in part. Because Griffin presents sufficient evidence to establish a dispute of fact as to whether she was a qualified individual and whether her disability caused her termination from the Academy, the Court denies the City's motion as to Griffin's discrimination claim under the ADA and IHRA. However, because Griffin cannot present admissible evidence that she made a

request for accommodation, the Court grants the City's motion as to Griffin's reasonable accommodation claim under the ADA and IHRA.

## BACKGROUND[1]

### I. CFD's Paramedic Hiring Process

Griffin sought employment with the City of Chicago as a paramedic for the Chicago Fire Department in 2015. CFD paramedics provide emergency medical services, delivering lifesaving care and treatment to those in critical need. Paramedics' job responsibilities include: "(1) responding to emergency and non-emergency calls; (2) driving ambulances on streets and highways during emergency and non-emergency conditions while operating the ambulance's sirens and radio; (3) physical lifting and moving patients under emergency response conditions from various positions onto various patient movement devices; (4) administering treatment to sick and injured persons at fire and emergency scenes by assessing the nature and extent of an individual's illness or injury and following established protocols; and (5) providing lifesaving treatment including external chest compression (CPR), spinal immobilization, and rapid takedown and extrication procedures." Doc. 142 ¶ 8. CFD paramedics work 24-hour shifts.

The process for becoming a fire paramedic with the CFD requires an applicant to complete several different steps. First, an applicant must be accepted into the Academy. An applicant who successfully submits her application to the Academy may then be called for processing, which the applicant must successfully complete before she is eligible to enroll in the Academy as a candidate paramedic. The requirements for processing include meeting all outstanding continuing education requirements for Illinois paramedics, completing a pre-hire

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, Doc. 142. The Court takes these facts in the light most favorable to Griffin, the non-movant. *See Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

physical abilities test, completing CFD's medical clearance process, and obtaining a valid Illinois EMT-P license, CPR certification, and Advanced Cardiac Life Support certification.

## II. CFD's Policies

### A. Suspended Assignment Policy

A candidate paramedic may seek deferral of academy classes under the Suspended Assignment Policy. A candidate paramedic must be deemed medically fit and have completed CFD's medical screening process before qualifying for the Suspended Assignment Policy. Under the Suspended Assignment Policy, if a candidate paramedic has accrued more than five days of excused absences due to illness or injury and has been found medically fit, CFD may place that candidate on suspended assignment. If CFD places a candidate paramedic on suspended assignment, the candidate paramedic no longer attends Academy training and has her status as a city employee suspended. The candidate paramedic would enter the next regularly scheduled Academy class so long as she meets all normal and customary hiring prerequisites. Between January 1, 2016 and August 31, 2020, CFD allowed at least seventeen individuals to defer to a later CFD paramedic academy.

### B. Reasonable Accommodation Policy

CFD also maintains a Reasonable Accommodation Policy. Under the policy, employees with disabilities who need accommodation must notify the City of their disability and need for accommodation. To do so, an employee should submit a written request for accommodation and, where necessary, documents from her medical provider that substantiate her disability, to CFD's Disability Liaison or the City's Disability Officer. Once the employee submits the proper

paperwork, the City and employee must engage in an interactive discussion regarding an appropriate accommodation.

### III. Griffin's 2015 Candidacy and the *Livingston* suit

Griffin enrolled in the Academy in June 2015. While participating in one of the physical tests required of candidate paramedics, the Lifting and Moving Sequence, Griffin suffered a hip injury for which she ultimately needed surgery. As a result of her injury, CFD placed Griffin on suspended assignment. On August 2, 2016, after Griffin had been on suspended assignment for a year, CFD terminated Griffin's employment.

Griffin and other CFD candidate paramedics filed a lawsuit against CFD on October 28, 2016, asserting that CFD terminated them because of their sex. *See Livingston et. al v. City of Chi.*, No. 16 C 10156 (N.D. Ill). As part of settlement discussions in the *Livingston* suit, on January 2, 2019, Griffin and CFD negotiated and executed a Term Sheet, which provided Griffin with the hiring opportunity of candidate paramedic in the first paramedic training academy class in 2019. Griffin agreed that the proposed hiring opportunity would be conditioned on her ability to meet CFD's hiring standards, appear for processing, and complete an updated investigation, drug testing, and medical evaluation, conducted by CFD's Medical Division. The Term Sheet provided that if Griffin disputed the Medical Division's determination of her medical fitness, an independent medical examination ("IME") conducted by one of the doctors listed in the Term Sheet would resolve those concerns. It also permitted Griffin to defer to a later academy class if the IME was unable to determine Griffin's fitness for duty within the required time period or if Griffin was unable to enter the April Academy for reasons CFD considered or had in the past

4

considered eligible for deferral. The Term Sheet did not require Griffin to waive or release her *Livingston* claims.

## IV. Griffin's Medical History

In August 2015, Griffin's primary care doctor, Michael Loiacono, diagnosed Griffin with adjustment disorder with anxious mood and secondary insomnia. Dr. Loiacono found Griffin's injury from the CFD physical test, the loss of her job, and continued uncertainty regarding her future at CFD triggered her adjustment disorder. He prescribed Griffin alprazolam[2] in a dose of 0.5 milligrams to help with her anxiety and trouble sleeping. Griffin only took alprazolam at night. Alprazolam is a benzodiazepine and is classified as a Schedule IV controlled substance because of its potential for addiction and abuse. The National Fire Protection Association standards note that benzodiazepines compromise a firefighter's ability to safely perform her job. While CFD does not have an express policy banning the use of benzodiazepines, CFD discourages their use, both on and off the job.

By December 2015, Dr. Loiacono increased Griffin's prescription for alprazolam to one milligram. Dr. Loiacono did not intend for Griffin to take alprazolam daily or for an extended period when he initially prescribed the medicine in 2015. Several months after increasing Griffin's alprazolam dosage, Dr. Loiacono prescribed Griffin trazodone to help with her insomnia. Trazodone is a tetracycline antidepressant that physicians can also use to treat insomnia. The City has employed individuals who have used alprazolam or trazodone as

---

[2] Alprazolam is more commonly known as Xanax.

paramedics and/or firefighters, and has allowed at least one paramedic who used alprazolam or trazodone to complete the Academy.

By June 21, 2016, Griffin took 200 milligrams of trazodone to sleep at night, but the medication ultimately made her dizzy and did not help her sleep. Griffin continued to fill her alprazolam prescription through March 27, 2019, when Dr. Loiacono instructed Griffin to stop taking alprazolam and instead only take trazodone at the highest tolerable dose. Griffin stopped taking alprazolam on March 27, 2019, and remained off the medication for over a year, except for taking one dose on April 16, 2019 to sleep. Griffin stopped taking trazodone at least by April 11, 2019, except for taking one dose on April 16, 2019 to sleep. Griffin did not have any withdrawal symptoms from stopping those medications. In December 2020, Griffin resumed taking alprazolam. As of November 19, 2021, Griffin was taking 1 milligram of alprazolam and 150 milligrams of trazodone.

### V. Griffin's Medical Evaluations in March 2019

Pursuant to the Term Sheet, Griffin submitted to an initial medical evaluation performed by Concentra, a medical vendor for CFD, on March 8, 2019. She reported her ongoing insomnia and anxiety as well as her use of 100 milligrams of trazodone and 1 milligram of alprazolam, which she noted began in August 2015. Griffin reported that she was not "currently disabled." *Id.* ¶ 53.

Dr. William Wong, a former director of CFD's Medical Division, concluded the results of Griffin's initial medical screening required further review and requested Griffin's treating physician provide his notes about her clinical progress and ability to work as a paramedic. In response to that request, Dr. Loiacono confirmed Griffin's diagnosis with adjustment disorder with anxious mood and secondary insomnia and her use of 100 milligrams of trazodone and 1

6

milligram of alprazolam to treat her conditions. Dr. Loiacono also checked the box on the request form that Griffin was capable of "safe and effective job performance as a Paramedic," and noted that Griffin "will not use [alprazolam] while on duty." *Id.* ¶ 55.

Dr. Wong had additional concerns based on the information he received from Dr. Loiacono, including her long-term use of alprazolam, which can have short- and long-term effects on cognitive functioning. Dr. Wong recommended that Griffin be evaluated psychologically through a psychological fitness for duty evaluation by a specialist, but Griffin disputed whether the Term Sheet permitted a request for a psychological evaluation.

On March 27, 2019,[3] the parties agreed to proceed to an IME. Griffin selected Dr. David Marder to perform the IME. In advance of Dr. Marder's evaluation, Griffin received additional evaluations by Dr. Loiacono and Dr. Eric Scheiber, an addiction psychiatrist, who both wrote letters to Dr. Marder with the results of their evaluations. Dr. Loiacono wrote that Griffin agreed to quit taking alprazolam entirely and increase her dosage of trazodone instead. He again concluded that Griffin was fully capable to perform the functions of paramedic. Dr. Scheiber stated that Griffin received an appropriate prescription for alprazolam and that if she took it as prescribed, it would not interfere with her work. Dr. Scheiber did not review Griffin's prior medical records when reaching his conclusion. Dr. Scheiber, like Dr. Wong and Dr. Loiacono, had general concerns about long-term use of alprazolam in part due to the possibility of addiction.

On March 29, 2019, Dr. Marder conducted Griffin's IME. Dr. Marder decided at the end of the exam that he could not "determine fitness for duty within the time provided" because of

---

[3] On March 26, 2019, the Court reopened the referral for the parties to return to alternative dispute resolution before Judge Kim if needed to address issues with processing candidates for medical examinations. *See Livingston*, No. 16 C 10156, Doc. 489 at 7.

"the complex nature of the case including current medications, [and] safety [] sensitive issues." *Id.* ¶ 67. While Dr. Marder completed his IME, Griffin enrolled conditionally in the April 1, 2019 Academy pursuant to a Court order.

On April 10, 2019, Dr. Marder completed his IME and found Griffin not fit for duty. Dr. Marder noted that "at this time, with [Griffin's] current alprazolam prescription and reported frequency of use, and with her concomitant use of trazodone and self-reported increase in bedtime doses when she chose to not take alprazolam, [Griffin] is not medically fit for duty as a Chicago Fire Department paramedic." *Id.* ¶ 73. He stated his concern of "an increased risk of motor vehicle crash as she is currently prescribed alprazolam and trazodone" and his concern "that she may not be fully prepared or comfortable to stop taking alprazolam, as evidenced by her increased trazodone use when not taking her alprazolam earlier this week." *Id.* The parties agreed during a status hearing on April 11, 2019 that Griffin "had reached the end of the line and was done pursuant to the Term Sheet." *Id.* ¶ 74.

On May 29, 2019, Griffin reapplied to the Academy for the July 2019 class. CFD requested Dr. Wong's opinion as to whether Griffin could be cleared for the July 2019 Academy. Dr. Wong opined that Griffin should be reevaluated no sooner than six months following her discontinuation of alprazolam. Griffin appeared on the 2019 paramedic referral list on December 2, 2019.[4] CFD first started calling applicants from the 2019 referral list in 2021. Griffin enrolled in the April 2023 Academy.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[4] Griffin's termination papers noted she had been "terminat[ed] for cause," which designated her as "ineligible for rehire." Doc. 142 ¶ 79. On December 16, 2020, the City informed Griffin of the error of

56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).  The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wehrle*, 719 F.3d at 842 (7th Cir. 2013).  However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

**ANALYSIS**

**I.    Disability Discrimination**

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

---

designating her as ineligible for rehire and removed that status.  The error did not prevent Griffin from appearing on the paramedic referral list or entering the Academy at an earlier date.

privileges of employment." 42 U.S.C. § 12112(a). To establish a disability discrimination claim, Griffin must show: (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) her disability was the "but for" cause of the adverse action.[5] *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503–04 (7th Cir. 2017).

Griffin asserts her disability is her adjustment disorder with anxious mood and secondary insomnia. The City does not challenge whether this qualifies as a disability within the meaning of the ADA. However, the City challenges both whether Griffin was qualified to perform the essential functions of her job and whether Griffin's disability constituted the "but for" cause for the City's refusal to allow her to reenter the Academy and its ultimate termination of her employment. Because the Court finds that Griffin has presented sufficient evidence to establish a material dispute of fact as to both issues, the Court denies the City's motion for summary judgment as to Griffin's discrimination claim.

A. **Qualified Individual**

Griffin argues that a question of fact exists as to whether she was a qualified individual for the role of a paramedic under the ADA. An employee is a qualified individual with a disability if, "with or without reasonable accommodation, [she] can perform the essential functions of the [job]." 42 U.S.C. § 12111(8); *see Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014). It is a question of fact what constitutes an "essential" function of a job. *See E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 920–21 (7th Cir. 2016) ("[A]

---

[5] Claims under the IHRA rely on the same analysis as those under the ADA, so the Court evaluates Griffin's claims together. *See Nutall v. Terminals*, No. 1:14 CV 4738, 2015 WL 9304350, at *8 (N.D. Ill. Dec. 22, 2015) ("The Illinois Supreme Court instructs that in evaluating claims of discrimination brought under the IHRA, courts should apply the same test employed by federal courts in evaluating causes of action brought pursuant to . . . the ADA.").

rational jury could have concluded that heavy lifting was a fundamental duty of the PSM position, rather than merely a marginal function."). Whether an individual is qualified for a job must be based on "an individualized assessment of the individual and the relevant position," rather than generalizations and assumptions. *E.E.O.C. v. Amsted Rail Co.*, 280 F. Supp. 3d 1141, 1152 (S.D. Ill. 2017) (citing *Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir. 1997)). The Court must limit its analysis to the date of the employment decision. *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998). Here, CFD found Griffin medically unfit and terminated her position in the Academy in April 2019, so the Court evaluates the evidence available at that time. Griffin maintains the burden to prove that she is a qualified employee. *Taylor-Novotny*, 772 F.3d at 493.

To assert that Griffin was not a qualified individual, the City relies on the medical opinions of Dr. Wong and Dr. Marder, who concluded that Griffin's long-term and ongoing use of alprazolam would interfere with her position as a paramedic. Dr. Marder, for example, based his decision that Griffin was medically unfit in part on his concern that her alprazolam and trazodone prescriptions posed "an increased risk of motor vehicle crash." Doc. 142 ¶ 73. The parties agree that one function of a paramedic—although notably not presented as an "essential" function in the parties' stipulated joint facts—includes "driving ambulances on streets and highways during emergency and non-emergency conditions while operating the ambulance's sirens and radio." *Id.* ¶ 8.

Griffin challenges Dr. Wong and Dr. Marder's conclusions with opinions from two other doctors—Dr. Loiacono and Dr. Schieber—who both determined that Griffin's use of alprazolam would not influence her ability to perform her duties as a paramedic. At its core, the different conclusions reached by all four doctors as to Griffin's ability to perform her job duties based on

11

her use of alprazolam present a material dispute of fact. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002) (finding evidence from doctors reaching contradicting conclusions over whether a plaintiff was physically qualified to be a police officer "creates a disputed question of fact"); *E.E.O.C. v. Outokumpu Stainless USA, LLC*, No. CV 20-521-CG-B, 2022 WL 4004769, at *11 (S.D. Ala. Sept. 1, 2022) ("The Court finds that these facts [including testimony that Burress only took Xanax to sleep and did not experience the side effects of Xanax at work and expert testimony], especially the differing opinions between the relevant physicians, when considered with the lack of dispute that Xanax affects every person differently, create a question of material fact as to whether Burress posed a direct threat."). And while the City argues Dr. Scheiber's and Dr. Loiacono's conclusions are questionable, those kinds of credibility determinations are inappropriate on summary judgment. *See Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2013) (overturning grant of summary judgment for employer because the district "judge was attempting to resolve a genuine factual dispute without a trial"); *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reminding district courts to view "the evidence in the light most favorable to the plaintiff" and avoid "mak[ing] credibility determinations, weigh[ing] the evidence, or decid[ing] which inferences to draw from the facts"). Accordingly, the Court finds that Griffin presented sufficient evidence to establish a material question of fact of whether she was a qualified individual.

    **B.**    **Causation**

To survive summary judgment on a discrimination claim, "a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the but for reason for the adverse action." *Monroe*, 871 F.3d at 504. That is because, when evaluating a claim for

disability discrimination, "[i]t is essential for the plaintiff to link the adverse action with his disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). "But-for" causation can be proved by "direct or circumstantial evidence, with circumstantial evidence encompassing, among other things, suspicious timing and pretext for the adverse employment action." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). Following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises*, *Inc.*, courts no longer separate the analyses for direct and indirect evidence. 834 F.3d 760, 765 (7th Cir. 2016). And while the Seventh Circuit still recognizes the burden shifting framework under *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973), it emphasizes that "all evidence must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.

      The City argues that Griffin cannot show causation under either *Ortiz* or the *McDonnell Douglas* burden shifting framework. Griffin does not frame her argument under either *Ortiz* or *McDonnell Douglas* and instead states she has direct evidence that her disability caused her termination. However, the Seventh Circuit disregarded the distinction between direct and indirect evidence in *Ortiz*, and so the Court finds it appropriate to conduct only one inquiry into whether "the evidence [as a whole] would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristic] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Carson v. Lake Cnty., Ind.*, 865 F.3d 526, 533 (7th Cir. 2017) ("However the plaintiff chooses to proceed, at the summary judgment stage the Court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of her [disability].")

      Courts recognize that adverse actions taken against a disabled individual because of the medication they use to treat their disabilities violates the ADA. *See, e.g.*, *Farris v. Kohlrus,* No.

13

17-CV-3279, 2023 WL 1971143, at *6 (C.D. Ill. Feb. 13, 2023) (finding an IDOC policy that applied only to individuals taking psychotropic medication violated the ADA because it "screens out" individuals with disabilities by targeting their treatment methods); *Haynes v. City of Montgomery*, 344 F. App'x 519, 520 (11th Cir. 2009) (holding that plaintiff presented sufficient evidence that employer discriminated against him based on perceived performance limitations from use of prescription medications). Here, Dr. Loiacono prescribed Griffin alprazolam and trazodone to treat her adjustment disorder with anxious mood and secondary insomnia. And the undisputed evidence reflects that Dr. Marder concluded that Griffin was not medically fit for duty because of "her current alprazolam prescription and reported frequency of use, [along] with her concomitant use of trazodone and self-reported increase in bedtime doses when she chose to not take alprazolam." Doc. 142 ¶ 73. Similarly, the parties agree that Griffin reached "the end of the line" with respect to the Term Sheet following Dr. Marder's conclusion that Griffin was not medically fit. *Id.* ¶ 74. Therefore, a reasonable juror could conclude that Griffin's removal from the April 2019 Academy occurred because of her use of alprazolam and trazodone, which Griffin took to address her underlying disabilities.

The City nonetheless argues that it reasonably relied on Dr. Wong's and Dr. Marder's conclusions when removing Griffin from the Academy and terminating her employment. "[G]enerally, an employer is entitled to rely on a medical opinion about whether an applicant can perform the essential functions of a job" so long as the "medical opinion was reached after a doctor performed an individualized examination of the employee." *Amsted*, 280 F. Supp. 3d at 1156; *Branham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004) ("[B]oth the letter and the spirit of the ADA require an individualized assessment of each plaintiff's actual condition, rather than a determination based on general information about how an uncorrected impairment usually

14

affects individuals." (citation omitted) (internal quotation marks omitted)). Here, Griffin has provided sufficient evidence to challenge whether Dr. Wong's and Dr. Garner's evaluations were individualized.

As to Dr. Wong, the parties agree that he did not evaluate Griffin in person prior to reaching his medical conclusion, Doc. 142 ¶ 102. Instead, Dr. Wong relied, at least in part, on his prior experience with a former patient who reported taking 1 milligram of alprazolam a day and had performance issues. *Id.* ¶ 56. Those conclusions are generalized and reflect a fear of future threat, which courts have found do not constitute an individualized examination. *See Amsted*, 280 F. Supp. 3d at 1153 (denying summary judgment where the doctor imposed medical restrictions "based on his perception of a future threat, not a present inability to do the chipper job" and "based on a generalized assumption about an abnormal NCT").

Dr. Marder based his conclusions on Griffin's self-reported history of alprazolam and trazodone use, the physical examination he performed on Griffin on March 29, 2019, and Griffin's other medical history—including the progress notes from CFD's Medical Division, Dr. Loiacono's Progress Notes, Griffin's Prescription Monitoring Program History, the results of Griffin's initial medical examination in March 2019, CFD's request for further information, and Dr. Loiacono's March 20, 2019 letter. Dr. Marder also cited various studies including guidelines from the American College of Occupational and Environmental Medicine indicating that persons should not take alprazolam within 36 hours of performing safety-sensitive work and that law enforcement officers who use benzodiazepines short term should be taken off duty, as well as a 2007 study showing that Norwegian drivers who were prescribed benzodiazepines were 2.9 times more likely to be involved in a motor vehicle accident than those who were not exposed to benzodiazepines or opioids. To challenge Dr. Marder's evaluation, Griffin offers Dr. Scheiber's

15

testimony that Dr. Marder's conclusions based on the 2007 study was "a generalization and a leap." Doc 155 at 13. She also challenges Dr. Marder's preference for relying on various studies that do not align with her self-reported lack of side effects. Further, Griffin offers the opinions of Dr. Loiacono and Dr. Scheiber that she was, in fact, fit for duty as of April 11, 2023. Taken together, Griffin has produced sufficient evidence to create a question of fact as to the reliability of Dr. Marder's conclusion that she was not medically fit to perform her role as a paramedic, subsequently creating an issue of fact for the jury to determine whether the City acted reasonably in relying on Dr. Marder's conclusion. As such, the Court denies the City's motion for summary judgment as to Griffin's disability discrimination claim.

## II.     Failure to Accommodate

The City also moves to dismiss Griffin's failure to accommodate claim, which Griffin bases on the City's denial of her request to defer to a later academy class once she had been dismissed from the April 2019 Academy. To establish failure to accommodate, Griffin must present evidence that (1) she is a qualified individual with a disability, (2) the City was aware of her disability, and (3) the City failed to reasonably accommodate her disability. *See Hooper*, 804 F.3d at 852. The City focuses its arguments on the third prong—whether it failed to reasonably accommodate Griffin's disability. "An employer satisfies its duty to reasonably accommodate an employee with a disability when the employer does what is necessary to allow the employee to work in reasonable comfort." *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). An employer need only provide a qualified individual with a "reasonable accommodation, not the accommodation [the employee] would prefer." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012).

Generally, "a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000).[6] Here, the parties dispute whether Griffin's request for accommodation constitutes admissible evidence, or if the Court must exclude it as privileged because the request occurred during settlement talks related to Griffin's claims in *Livingston*. Local Rule 83.5 excludes from evidence "all non-binding alternative dispute resolution ('ADR') proceedings referred or approved by any judicial officer of this court in a case pending before such judicial officer, including any act or statement made by any party, attorney or other participant" because those statements are "in all respects, [] privileged." N.D. Ill. LR 83.5. The rule exists to encourage parties to participate in candid conversations during ADR discussions. *MicroMetl Corp. v. Tranzact Techs., Inc.*, No. 08 CV 03257, 2010 WL 4623797, at *3 (N.D. Ill. Nov. 5, 2010) (acknowledging the "strong policy prohibition against revealing confidential settlement offers"); *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 368 (N.D. Ill. 2001) ("Allowing discovery of negotiations between parties to an ongoing litigation can have a chilling effect on the parties' willingness to enter into settlement negotiations.").

Griffin argues that her request for accommodation, which she states she made on a phone call on April 11, 2019, occurred independent of any settlement conversation so Local Rule 83.5 should not bar it. However, the record reflects that Griffin's request occurred within the context of ongoing settlement discussions. Griffin asked for a delay in placement at the Academy after learning that Dr. Marder found her not medically qualified to attend the April 2019 Academy.

---

[6] Courts have recognized an exception to this general rule for employees with mental disabilities. *See Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996); *Forman v. City of Middleton*, No. 20-CV-516-JDP, 2022 WL 3655264, at *1 (W.D. Wis. Aug. 25, 2022). However, Griffin has not argued that her disability prevented her from knowing how to ask for the accommodation. *See Bultemeyer*, 100 F.3d at 1285 ("[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

When Griffin's counsel had the conversation about deferral with the City, the Court had already reopened the ADR proceedings for the parties before Judge Kim on March 26, 2019 to allow the parties to discuss concerns relating to the medical examination of certain *Livingston* plaintiffs, including Griffin. *See Livingston*, No. 16 C 10156, Doc. 489 at 7. As Griffin's counsel admitted in her deposition, the parties agreed to discuss Griffin's ability to defer entry into the Academy with Judge Kim. Doc. 155-3 at 57 ("[W]e agreed that the issue should be dealt with in the referral with Judge Kim. The referral had been reopened for the purpose of dealing with our— Ms. Griffin's medical issues."); *id.* at 60 ("[T]he issue went to Judge Kim. The referral was open and everything was—whatever there was, was handled in the context of the mediation."). As the Court explained in *Livingston* when considering the admissibility of evidence of the reinstatement offers the City made to Plaintiffs during settlement discussions, regardless of whether the parties made statements in Judge Kim's presence, statements made as part of or in furtherance of the ADR proceedings ordered by this Court fall within Local Rule 83.5. *Livingston*, No. 16 C 10156, Doc. 517. Because the statements occurred in the context of ADR proceedings, they are inadmissible under Local Rule 83.5, and therefore the Court cannot consider them on summary judgment. *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) (explaining that courts may not consider inadmissible evidence on summary judgment). This leaves Griffin without admissible evidence of a request for accommodation, meaning that her failure to accommodate claim fails. *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014) (granting summary judgment where the plaintiff failed to produce sufficient evidence that he made a request for accommodation).

## CONCLUSION

For the foregoing reasons, the Court grants the City's motion for summary judgment [141] in part. The Court enters judgment for the City on Griffin's failure to accommodate claims. Griffin's discrimination claims under the ADA and IHRA may proceed to trial.

Dated: January 22, 2024

_____
SARA L. ELLIS
United States District Judge